Nancy JOHNSON, Petitioner–Appellant,

v.

**UNITED STATES RAILROAD
RETIREMENT BOARD,**
Respondent–Appellee.

Nos. 90–1243, 90–5380.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 23, 1991.

Decided July 10, 1992.

Rehearing Denied Sept. 11, 1992.

Gill Deford, with whom Neal S. Dudovitz, Los Angeles, Cal., and Toby S. Edelman, Washington, D.C., were on the brief, for petitioner.

Karl T. Blank, Gen. Atty., R.R. Retirement Bd., Chicago, Ill., and Susan A. Nellor, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., Steven A. Bartholow, Deputy Gen. Counsel, and Edward S. Hintzke, Asst. Gen. Counsel, R.R. Retirement Bd., Chicago, Ill., were on the brief, for respondent.

Before MIKVA, Chief Judge, WALD and BUCKLEY, Circuit Judges.

Opinion for the Court filed by Chief Judge MIKVA.

Opinion concurring in part and dissenting in part filed by Circuit Judge BUCKLEY.

MIKVA, Chief Judge:

In a bold challenge to judicial authority, the United States Railroad Retirement Board argues that it is free, when it chooses, to ignore the decisions of United States courts of appeals. Since 1981, the Board has cut off benefits for the spouses and widows of railroad workers after their dependent children turn sixteen, even though the Railroad Retirement Act of 1974, 45 U.S.C. §§ 231–231v (1988), says that they are entitled to benefits until the children turn eighteen. In 1985, the Court of Appeals for the Eighth Circuit rejected the Board's position that an amendment to the Social Security Act required the change. *Costello v. United States R.R. Retirement Bd.*, 780 F.2d 1352 (8th Cir.1985). The Board, however, refused to apply the *Costello* decision, even within the Eighth Circuit, and continued to deny benefits at the administrative level. In March 1991, the Court of Appeals for the Eleventh Circuit rejected the Board's position for the same reasons as the Eighth Circuit. *Johnson v. United States R.R. Retirement Bd.*, 925 F.2d 1374 (11th Cir.1991). The Board still refuses to acquiesce. Since individual challenges have been ineffective, Nancy Johnson, whose spousal benefits were denied, tried to bring a class action in district court challenging the Board's interpretation of the Railroad Act and its policy of intracircuit nonacquiescence.

Because we think that Mrs. Johnson has not been denied "meaningful" access to judicial review, we uphold the district court's conclusion that the Railroad Act vests exclusive jurisdiction in the courts of appeals. But we join the Eighth and Eleventh Circuits and reject the Board's interpretation of the Railroad Act for the third time. We also think that the Board's unapologetic policy of nonacquiescence is inconsistent with the Board's own jurisdictional arguments and troubling on statutory and constitutional grounds. If the Board continues to deny benefits after our decision today, we expect that the policy itself can be directly challenged in an appropriate action before this court.

## I. BACKGROUND

Nancy Johnson is the wife of Edward Johnson, a former railroad employee. As the mother and stepmother of his five children, the Board found her eligible for a spousal annuity effective September 10, 1976. In late 1986, the Board notified her that the Tier I component of her annuity would be cut off on April 1, 1987, when her youngest child turned sixteen. (The Railroad Act divides the benefit into two tiers, with separate eligibility criteria). On reconsideration, Mrs. Johnson's claim was denied, and her monthly payment was reduced from $391.11 to $84.11. She filed an administrative appeal, and was told that the issue presented "was solely a matter of law," and did not require a hearing. The first appeals referee denied Mrs. Johnson's claim, and came to the remarkable conclu-

sion that the *Costello* case requires her benefits to be terminated, even though the case explicitly requires the opposite result. Railroad Bd. No. 90–1243 (Sept. 29, 1987). A second appeals referee reopened the decision and again rejected her argument, noting that *"Costello* was not a class action case and the Board did not pursue it further." *Id.* (July 12, 1988). Mrs. Johnson appealed again, and on May 16, 1989, a three-member panel of the Board issued its final decision, affirming the decision of the second appeals referee in a one-sentence order. The third panel member dissented vigorously, calling the Board's policy of nonacquiescence "grossly unjust" and urging payment of Tier I benefits to all widows and spouses with children between sixteen and eighteen. *Id.* (May 16, 1989) (Chamberlain, C.J., dissenting).

Having exhausted her administrative remedies, Mrs. Johnson filed a class action in district court, suing individually and on behalf of similarly situated beneficiaries under the Act. She claimed that the Board's denial of full benefits to those in her circumstances violated the Act and the Fifth Amendment's Due Process clause. She also claimed that the Board's policy of intracircuit nonacquiescence violated the statutory and constitutional rights of her class.

The district court decided that the Railroad Act gives the federal courts of appeals exclusive jurisdiction to review the Board's decisions. Concluding, accordingly, that it lacked subject matter jurisdiction over Mrs. Johnson's complaint, it transferred her case to this court pursuant to 28 U.S.C. § 1631 on July 12, 1990. This presented Mrs. Johnson with a dilemma: although an appeals court can adjudicate her individual claim, it cannot adjudicate the class action; and if she chose to pursue the transfer, she would have to abandon the class action challenge. She chose instead to move for reconsideration, requesting that the district court dismiss her complaint, or that it certify its order finding no jurisdiction for interlocutory review under 28 U.S.C. § 129(b). While her complaint was pending in the district court, Mrs. Johnson petitioned this court for review, to protect her individual claim for benefits. The district court, in turn, granted reconsideration, vacated the transfer, and on October 4, 1990, dismissed Johnson's case for lack of jurisdiction.

This appeal followed.

## II. ANALYSIS

### A. *District Court Jurisdiction*

 Two circuits are split about whether district courts have subject matter jurisdiction to entertain class action suits raising purely legal challenges to the Board's determination of benefits under the Railroad Act. *Compare Linquist v. Bowen,* 813 F.2d 884, 888 (8th Cir.1987) (district court properly exercised mandamus jurisdiction under 28 U.S.C. § 1361 to entertain class action on behalf of dual beneficiaries under Social Security Act and Railroad Retirement Act) *with Denberg v. United States R.R. Retirement Bd.,* 696 F.2d 1193, 1197–98 (7th Cir.1983), *cert. denied,* 466 U.S. 926, 104 S.Ct. 1706, 80 L.Ed.2d 180 (1984) (reversing district court's exercise of jurisdiction over class action challenging Act's treatment of male and female spouses on equal protection grounds). Although Mrs. Johnson's jurisdictional argument is plausible, the logic of the precedents persuades us to reject it.

Section 10(b) of the Administrative Procedure Act says that "the form of proceeding for judicial review is the special statutory review proceedings relevant to the subject matter in a court specified by statute or, *in the absence or inadequacy thereof,* any applicable form of legal action ... in a court of competent jurisdiction." 5 U.S.C. § 703 (1988) (emphasis added). We begin, therefore, by asking whether the statutory review proceedings govern Mrs. Johnson's claim and, if they do, whether the review they provide is adequate.

Decisions of the Board must be reviewed according to the terms of the Railroad Retirement Act of 1974, 45 U.S.C. § 231g (1988). The relevant section, "Claims for benefits," says that

[f]indings of fact and conclusions of law of the Board in the determination of any claim for benefits or refund, the determination of any other matter pursuant to subsection (c) [concerning 'Hearing and review of decisions on claims'] ... shall not be subject to review in any manner other than that set forth in subsection (f) of this section.

45 U.S.C. § 355(g) (1988).

Subsection (f), in turn, says that "[a]ny claimant, or railway labor organization ... of which claimant is a member, or any other party aggrieved by a final decision under subsection (c) of this section, may, only after [exhausting administrative remedies], obtain a review of any final decision of the Board" in the U.S. Court of Appeals for the circuit in which he lives or works, or in the Court of Appeals for the District of Columbia Circuit or the Seventh Circuit.

Mrs. Johnson argues that § 355 refers (as its name suggests) to individual "claims for benefits," not to class actions challenging the Board's policies and practices. She points to *McNary v. Haitian Refugee Center, Inc.,* — U.S. ——, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991), in which the Supreme Court recently decided that a similarly worded section of the Immigration Reform and Control Act of 1986 forecloses district court review of individual applications but not "general collateral challenges to unconstitutional practices and policies used by the agency in processing applications." *Id.* 111 S.Ct. at 896. Just as the critical language in the Immigration Act refers to "a determination respecting an application," 8 U.S.C. § 1160(e) (1988), so Mrs. Johnson argues that the critical language in the Railroad Act refers to "the determination of any claim." 45 U.S.C. § 355(f).

We conclude, however, that the statutory review provision does govern Mrs. Johnson's case. First, the language in the Railroad Act is broader than the corresponding language in the Immigration Act. Subsection (f) of the Railroad Act refers not only to "the determination of any claim," but also to "the determination of any other matter" relating to the "review of decisions on claims." It also refers to judicial review of "any final decision," while the Immigration Act refers only to judicial review "of such a denial." Second, subsection (g) of the Railroad Act says that "[f]indings of fact and *conclusions of law"* shall be subject to review; while the Immigration Act refers only to "findings of fact and determinations contained in [the administrative] record." 8 U.S.C. § 1255a(f)(4)(B) (1988). The textual differences suggest to us that the Railroad Act contains a broader preclusion of district court jurisdiction than the Immigration Act does.

Although the text of the review provision seems to preclude district court jurisdiction, Mrs. Johnson argues that this court has already interpreted the legislative history to suggest a contrary result. Without deciding the jurisdictional question explicitly, we suggested in passing that "Congress did not have in mind a design to preclude class actions when it provided for direct review in the courts of appeals of decisions under the Railroad Retirement Act." *Burns v. United States R.R. Retirement Bd.,* 701 F.2d 189, 191 (D.C.Cir.1983). Before 1946, the district courts reviewed social security and railroad retirement determinations, while the courts of appeals reviewed determinations under the Railroad Unemployment Insurance Act. In the interest of economy and uniformity, Congress amended the Railroad Act so that cases involving both Railroad Acts would be resolved "in a single consolidated proceeding with a single court review." *Id.* at 191 (quoting S.Rep. No. 1710, 79th Cong., 2d Sess., pt. 2, at 21 (1946)). The Board suggests that this shows an intent to prohibit class actions; and it points to a statement by Lester P. Schoene, who helped to draft the 1946 amendment on behalf of railway labor: "[T]he judgment of three members on the circuit court is bound to be more carefully thrashed out than the judgment of one man," he said. *Hearings on H.R. 1362 Before the House Comm. on Interstate and Foreign Commerce,* 79th Cong., 1st Sess., pt. 3, at 1083–93 (1946) ("House Hearings"). But Mr. Schoene seems to have been referring to individual claims, not to class actions, and the Board does not explain why a labor representative

would design a bill to shield illegal Board policies from national challenges by the wives of railway workers. We conclude, in any event, that even if the legislative history raises questions about Congress's intent to preclude district court jurisdiction, they are not sufficient to overcome the text of the review provision, which seems relatively clear.

Having concluded that the statutory mechanism governs Mrs. Johnson's claim, we must now decide whether an exception is justified because the review offered is "inadequate" or less than "meaningful" within the meaning of the Administrative Procedure Act, 5 U.S.C. 703 (1988), *cf. McNary,* 111 S.Ct. at 898. The focus on the "adequacy" of judicial review is the one thread that runs throughout the cases; and it helps to reconcile decisions that appear to be irreconcilable, such as *Denberg* and *Linquist; McNary* and our recent decision in *Ayuda, Inc. v. Thornburgh,* 948 F.2d 742 (D.C.Cir.1991) (*"Ayuda IV"*). Mr. Denberg, for example, admitted that he could have gone to the court of appeals directly after the denial of his application. The *Denberg* court refused to find district court jurisdiction, noting that "[t]here was no problem of 'absence or inadequacy' of the special statutory review proceedings of section 5(f)." 696 F.2d at 1196. The *Linquist* court, by contrast, held that the district court *did* have mandamus jurisdiction over a challenge to the Social Security Administration and the Railroad Retirement Board. Direct review in the court of appeals was "inadequate," the court noted, because determinations of the social security administration are reviewed in the district court, and the defendants could not have been joined in a single proceeding before the court of appeals. 813 F.2d at 888.

In *McNary,* similarly, the Supreme Court noted "several aspects" of the statutory scheme that would preclude "meaningful" review in the courts of appeals. First, the lack of an administrative record in deportation proceedings meant that courts of appeals would "have no complete or meaningful basis upon which to review application determinations." 111 S.Ct. at 898. Second, most aliens can obtain review in courts

of appeals only if they voluntarily surrender themselves for deportation. "Quite obviously," the Court emphasized, "that price is tantamount to a complete denial of judicial review for most undocumented aliens." *Id.* Third, to challenge the INS policies, the Haitian Refugee Center had to gather a host of evidence which would have been irrelevant in an administrative hearing and unattainable in a court of appeals, without "the factfinding and record-developing capabilities of a federal district court." *Id.* For all three reasons, the Supreme Court concluded that "restricting judicial review to the courts of appeals ... is the practical equivalent of a total denial of judicial review of generic constitutional and statutory claims." *Id.*

And then there is *Ayuda,* in which the Supreme Court asked this court to reexamine its interpretation of a parallel provision of the Immigration Act, 8 U.S.C. § 1255a (1988), in light of *McNary. See* 880 F.2d 1325 (D.C.Cir.1989), *vacated and remanded,* — U.S. ——, 111 S.Ct. 1068, 112 L.Ed.2d 1174 (1991). The panel found, on remand, no reason to revise its original position that the district court lacked jurisdiction over broad challenges to an INS policy or legal position that could apply to many determinations. It focused on the *McNary* Court's conclusion that an inadequate administrative record made it "unlikely that a court of appeals would be in a position to provide meaningful judicial review" of deportation orders. 111 S.Ct. at 898. Since the administrative record in *Ayuda* was adequate, the panel concluded that judicial review was meaningful. *Ayuda IV,* 948 F.2d at 749.

In *McNary,* the Supreme Court noted that requiring aliens to turn themselves in for deportation before they can challenge INS policy "is tantamount to a complete denial of judicial review for most undocumented aliens." *McNary,* 111 S.Ct. at 898. The Seventh and Ninth Circuits have interpreted *McNary* to find district court jurisdiction over a challenge to a regulation limiting eligibility for legalization whose validity could have been raised by the alien plaintiffs in individual deportation proceed-

ings. *See Catholic Social Servs., Inc. v. Thornburg,* 956 F.2d 914, 920–21 (9th Cir. 1992) (Hug, J.) *cert granted sub nom. Barr v. Catholic Social Servs.,* — U.S. ——, 112 S.Ct. 2990, 120 L.Ed.2d 867 (1992); *Morales v. Yeutter,* 952 F.2d 954 (7th Cir.1991) (Posner, J.). Although its application of the principle is disputed in these other circuits, *Ayuda*'s focus on the adequacy of judicial review is consistent with the general logic of *McNary, Denberg,* and *Linquist.*

Applying that logic, we reject Mrs. Johnson's jurisdictional claim. Mrs. Johnson does not suggest that the relevant parties could not be joined in a single proceeding before the court of appeals, as in *Linquist,* 813 F.2d at 888. She does not suggest that the administrative record in her case is inadequate, as in *McNary;* nor does she suggest that claimants in her position have no access to judicial review because they fear a heavy penalty like deportation, or because the government refuses to deport them, as in *Ayuda.* 948 F.2d at 751.

Mrs. Johnson does argue forcefully that the Board's policy of nonacquiescence forecloses meaningful judicial review. The Board refuses to petition for Supreme Court review of adverse circuit court rulings in individual appeals, and at the same time, it continues to apply the rejected interpretation not only in other circuits, but to other individuals' claims in the same circuit. The practical effect of this policy, Mrs. Johnson says, is to insure that few claimants will actually obtain the relief to which federal courts say they are entitled by law. We agree that the Board's policy raises grave constitutional and statutory questions, and we will address them below. But we are not persuaded that the policy is "tantamount to a complete denial of judicial review" for most claimants, as in *McNary;* especially because if the nonacquiescence policy is unlawful, we think it can be directly challenged before our court. Because we can provide meaningful review to spouses and widows who have the patience and means to seek it, we affirm the district court's conclusion that it lacked jurisdiction over the class action, and we turn to the merits of Mrs. Johnson's claim.

### B. *Mrs. Johnson's Entitlement*

Two circuit courts have reviewed the "tortuous" history of the relationship between the Railroad Act and the Social Security Act, and rejected the Board's interpretation. *See Costello v. United States R.R. Retirement Bd.,* 780 F.2d 1352 (8th Cir. 1985); *Johnson v. United States R.R. Retirement Bd.,* 925 F.2d 1374 (11th Cir. 1991). We join the Eighth and Eleventh Circuits and reject the Board's position once more.

The Railroad Act says clearly that a qualified spouse "shall ... be entitled to a spouse's annuity ... in the amount provided under 231c of this title" if, "in the case of a wife, [she] has in her care ... a child who meets the qualifications prescribed in (iii) of section (d)(1)...." 45 U.S.C. § 231a(c) (1988). Section (d)(1)(iii) defines "child" as one who is under 18 years of age.

Section 231c(a), in turn, defines the amount of the entitlement:

> (1) The annuity of a spouse ... shall be in an amount equal to the amount ... of the wife's insurance benefit ... to which such spouse *would have been entitled* under the Social Security Act ... if such individual's service as an employee after December 31, 1936, had been included in the term "employment" as defined in the [Social Security] Act.

45 U.S.C. § 231c(a) (1988) (emphasis added).

There was no conflict between the Railroad and Social Security Acts before 1981, since the eligibility requirements in both were the same. In 1981, however, as part of the Omnibus Budget Reconciliation Act, Congress cut Social Security Benefits by lowering the age of termination for children's benefits under the Social Security Act from 18 to 16. Pub.L. No. 97–35, § 2205, 95 Stat. 357 (amending 42 U.S.C. § 402(s)(1)). It did not amend the parallel provision in the Railroad Act. The question, therefore, is whether Congress intended spousal annuitants under the Railroad Act, like the Social Security Act, to lose

their benefits once their children turn sixteen.

The Board's initial response to the question was remarkably wooden. In 1981, it issued a legal opinion insisting that "[t]he eligibility provisions of the Railroad Retirement Act were not affected by" the Omnibus Budget Act and that spouses and widows remain "entitled to a benefit as long as they have a minor child of the employee under age 18 in their care and custody." Legal Opinion L–81–193. The Opinion interpreted the amended Social Security Act, however, to reduce the Tier I *amount* due to widows and spouses with children between sixteen and eighteen to "zero." Those whose Tier II benefits were calculated as 30% of Tier I would receive "zero" Tier II benefits as well. *Id.*

In *Costello,* the Eighth Circuit held that the Board's interpretation lacked a reasonable basis in law because it forces annuitants to meet the eligibility requirements of *both* statutes, even though the Railway Act refers to the Social Security Act only for the purpose of determining the *amount* an eligible Social Security annuitant *would have received.* "Determination of the amount of an annuity," the court concluded,

> has two distinct steps. The threshold question is whether a claimant is entitled to an annuity. For this first question, one refers to the entitlement section of the appropriate act. If, under either act, entitlement exists, the second step is to refer to the social security regulations to determine the amount of benefits.

780 F.2d at 1355; *see also Johnson,* 925 F.2d at 1377.

In response to the *Costello* decision, the Board issued a new policy in 1986, which Mrs. Johnson now challenges. The Board continues to maintain that widows and spouses are entitled to "zero" Tier I benefits after their children turn sixteen, even though *Costello* requires the opposite. But in an abrupt change, it has agreed to pay Tier II benefits to all widows until their children turn eighteen, even those whose Tier II benefits are required to be calculated as 30% of Tier I. Legal Opinion L–86–112.

■ The parties disagree about the appropriate level of deference to be applied. Both the Eighth and Eleventh Circuits held that the Board interpreted both the Railroad Act and the Social Security Act and considered their interrelationship. Because the Board was interpreting matters outside of its expertise—the Social Security amendments—it was not entitled to deference. *See Johnson,* 925 F.2d at 1378; *Costello,* 780 F.2d at 1354. The Board insists that the meaning of the Social Security Act is not in question. It is the Railroad Act that tells the Board to look to the Social Security Act, and the Board must decide whether the Railroad Act refers to the eligibility or merely the computational requirements of the Social Security Act. Since it claims merely to be interpreting its governing statute, the Board says it is entitled to deference.

We agree with the Eighth and Eleventh Circuits that the Board is not entitled to deference because it is not interpreting its governing statute alone, but rather the relationship between the Railroad Act and the Social Security Act. *See Costello,* 780 F.2d at 1354; *see also Johnson,* 925 F.2d at 1378. Therefore, *Chevron* does not apply.

The Supreme Court has emphasized recently that a "precondition to deference under *Chevron* is a congressional delegation of administrative authority." *Adams Fruit Co. v. Barrett,* 494 U.S. 638, 110 S.Ct. 1384, 1390, 108 L.Ed.2d 585 (1990). The reason is clear: *Chevron* review of agency interpretations of statutes applies only to regulations "promulgated pursuant to congressional authority," *NLRB v. United Food & Commercial Workers Union,* 484 U.S. 112, 123, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987). If agencies are simply interpreting a statute, but have not been granted the power to "administer" it, the principle of deference applies with less force. *See, e.g., Crandon v. United States,* 494 U.S. 152, 110 S.Ct. 997, 1011, 108 L.Ed.2d 132 (1990) (Scalia, J., concurring in the judgment) (more "specific re-

sponsibility for administering the law" is needed to trigger *Chevron* ).

"Under the law of this circuit," similarly, "when an agency interprets a statute other than that which it has been entrusted to administer, its interpretation is not entitled to deference." *Department of Treasury v. FLRA*, 837 F.2d 1163, 1167 (D.C.Cir. 1988). We have held repeatedly that when an agency interprets a general statute rather than its organic statute, this court is not bound by its construction, even if reasonable, but should engage in de novo review—guided, of course, by congressional intent. *Professional Airways Sys. Specialists v. FLRA*, 809 F.2d 855, 857 n. 6 (D.C.Cir.1987); *see also AFGE, Local 2782 v. FLRA*, 803 F.2d 737, 740 n. 1 (D.C.Cir. 1986).

Our colleague suggests that we should defer to the Board because "the nature of the relationship between the Railroad Retirement and Social Security Acts is defined entirely by the former." Dis.Op. at 1095. With respect, we think it equally plausible to say that the nature of the relationship is defined by the latter. The central event in this case is the 1981 amendment to the Social Security Act, which cut off eligibility to spouses when their children reached sixteen. In light of the Social Security Amendments, the Board has decided, in effect, that Railroad annuitants must meet the entitlement requirements of the Social Security Act *and* the Railroad Act. *Costello*, 780 F.2d at 1354. Although the Board tries to resist the implication, its position rests on an unconvincing premise about the intention of the framers of the Social Security Act: "Congress did not need to amend the [Railroad] Act because it knew sections 4(a)(1) and 4(f)(a) would incorporate any changes" in the Social Security Act. Brief for Respondent at 45. But the Board has no special expertise about the purpose of the Social Security Amendments. And the Board's attempts to justify its interpretation by referring to the Railroad Act alone are unpersuasive: It is, after all, a *relationship* we are construing.

There is no need to labor the debate about deference, however: even if we were to apply *Chevron*, we would be hard pressed to sustain the Board's interpretation as "reasonable" under step two. (There is no evidence that Congress "spoke directly to the precise question at issue" under step one, *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984)). The Omnibus Budget Act was, as its name suggests, massive, and the amendment to section 402(s) inspired no recorded debate. We agree with the Eighth and Eleventh Circuits that if Congress really had intended to reduce the entitlement requirements under the Railroad Act from age 18 to age 16, it would have done so explicitly. *Johnson*, 925 F.2d at 1379; *Costello*, 780 F.2d at 1355. Congress did, in fact, go out of its way to amend other subsections of the Railroad Act, and other subparts of the subsection in question, *see* Omnibus Act § 1117(c) (adding 45 U.S.C. § 231a(d)(1)(v)), but it left the 18–year–old cut-off date in 231a(d)(1) conspicuously intact. Like the Eighth and Eleventh Circuits, we think it unreasonable to conclude that Congress meant to create an entitlement with one hand and snatch it away with the other.

Rephrasing the question, our colleague thinks it reasonable to conclude that if Congress had intended to maintain Tier I payments at the pre–1981 level, it would have said so explicitly and provided for their funding. Dis.Op. at 7. But the text of the Railroad Act suggests the opposite. Section 231r of the Act, "[a]utomatic benefit eligibility requirement adjustments," says that if Congress amends the Social Security Act to *reduce* eligibility requirements or to *add* classes of eligible beneficiaries, the changes shall be automatically applicable to section 231a railroad retirement annuity claimants. We agree with the Eighth Circuit that this section suggests Congress's intention that automatic adjustments are appropriate only when eligibility requirements are liberalized, rather than restricted, and that an explicit authorization is necessary to reduce Railroad annuities. *Costello*, 780 F.2d at 1356. Given Congress's detailed amendments of other sections of the Railroad Act in 1981, and given

the remedial purposes of the Act, we think it unreasonable to infer an affirmative intent to cut off benefits from Congress's decision *not* to amend section 231c(i)(1).

The Board, finally, insists that its interpretation is compelled by the plain meaning of the Railroad Act. But it lacks the courage of its textualist convictions. The Board's initial position, although implausible, at least had the virtue of a wooden logic. (According to the 1981 Legal Opinion, the Social Security amendments left the "entitlement" provisions of the Railroad Act unchanged, but reduced the "amount" of the Tier I benefits to zero; Tier II benefits calculated as 30% of Tier I were reduced to zero as well). But the Board's response to *Costello* is not logical. Although the Board insists that the plain meaning of the Railroad Act reduces Tier I benefits to zero, it has agreed to pay Tier II benefits to all widows until their children turn eighteen, even to those whose Tier II benefits are calculated as 30% of Tier I. Legal Opinion L–86–112. Unless 30% of zero makes more than zero, the Board's arithmetic is bizarre. Its new position cannot be defended as a literal interpretation of the Railway Act (which, according to the Board's logic, would require certain Tier II benefits to be "reduced to zero"). It also cannot be defended as a faithful effort to acquiesce in a judicial decision with which the Board disagrees (the *Costello* decision requires Tier I *and* Tier II benefits to be paid).

Our colleague would "summarily" ignore the illogic of the Board's position because the issue of survivor's (as opposed to widow's) benefits is not formally before us. Dis.Op. at 1097. But "[i]n ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988). The fact that the Board's "plain meaning" interpretation is patently unreasonable when applied to one section of the statute calls into question the reasonableness and coherence of the Board's position as a whole.

For all these reasons, we reverse the Board's order and remand with directions to award to Mrs. Johnson a Tier I spouse's annuity for the period that began with the termination of her annuity and which ended when her youngest child turned eighteen.

## C. *Nonacquiescence*

"We have been grossly unjust," the dissenting Board member wrote, in refusing to follow the *Costello* case, even within the Eighth Circuit. "Moreover," he added, "the Court may severely criticize us for our handling of these cases." He was correct.

█ In response to the *Costello* case, the Board refused to pay Tier I benefits even within the Eighth Circuit, unless claimants complete the administrative process, which includes an initial decision, reconsideration, a hearing before a referee, and a final decision by the three-member Board itself. 20 C.F.R. § 259. At oral argument before this court, furthermore, the Board repeated its extraordinary position that an agency is not bound to respect the pronouncements of a U.S. Court of Appeals, even within its own circuit. Mrs. Johnson challenged the constitutionality of the nonacquiescence policy in her complaint, and asked for, among other things, mandamus relief. We think such a dramatic step would be premature, since the Board has not announced definitively that it will refuse to acquiesce in our decision today; and in the interest of judicial restraint, we will give the Board a chance to reconsider its position in light of our opinion. To inform the Board's response, however, we think it useful to suggest why the Board's policy is inconsistent with the Board's jurisdictional arguments and troubling on statutory and constitutional grounds.

First, the Board's entire jurisdictional argument is based on the claim that Congress put great stock on the efficiency and expertise of appellate review. But the same legislative history the Board quotes to suggest that Congress intended to preclude district court jurisdiction also suggests that Congress expected the Board to respect circuit court decisions rather than

to defy them. The Board put particular emphasis on the testimony of Mr. Schoene, the labor representative, who showed a special concern for avoiding the "further expense" of additional appeals that would be forced on a claimant if she lost in the district court. *House Hearings* at 1083–93 (1946). Yet the Board itself has put claimants to further expense and meaningless appeals by forcing them to exhaust their administrative remedies before they can receive benefits. Mr. Schoene also noted that "more careful consideration will be given to the entire case ... in the circuit court of appeals," *id;* and the Board took great pains to argue that Congress intended appellate judges to apply their expertise to legal challenges to the Board's policies. Now, however, the Board refuses to respect the "expert" judgments of appellate courts.

The Board's refusal to acquiesce, in short, undermines all of the advantages of appellate review that the Board insists Congress intended to recognize. To the degree that the Board's policy clashes with the intent of the framers of the Railroad Act, it cannot be sustained. More generally, defenders of nonacquiescence rely heavily on the premise that the "current administrative landscape" suggests an "implicit authorization of nonacquiescence," Estreicher & Revesz, *Nonacquiescence by Federal Administrative Agencies*, 98 YALE L.J. 679, 729 (1989). Evidence that Congress intended the opposite in this case leaves the argument without a foundation.

The Board's position also ignores basic rules of legal precedent, which are governed not by an inherent judicial hierarchy, but by the mechanisms of review provided by Congress. State courts, for example, are bound to follow Supreme Court precedent because if they do not, they can be reversed. Federal courts of appeals, by contrast, do not review state decisions, so their decisions are not generally considered binding precedent in state courts. In the current tax court, similarly, identical cases on the merits may receive different dispositions, because they are appealable to different federal circuits. Amar, *A Neo–Federalist View of Article III: Separating the Two Tiers of Federal Jurisdiction*, 65 B.U.L.REV. 205, 258–59 n. 170 (1985). The Board's refusal to acquiesce even in cases it knows will be appealed to the Eighth Circuit defies Congress's plan in making decisions under the Railroad Act reviewable by the courts of appeals in which the injury arose.

On the broadest level, the Board's position raises serious statutory and constitutional questions. Intracircuit nonacquiescence has been condemned by almost every circuit court of appeals that has confronted it. *See, e.g., Hyatt v. Heckler*, 807 F.2d 376, 379 (4th Cir.1986), *cert. denied,* 484 U.S. 820, 108 S.Ct. 79, 98 L.Ed.2d 41 (1987); *Stieberger v. Bowen*, 801 F.2d 29, 36–37 (2d Cir.1986); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir.1984); *Lopez v. Heckler*, 725 F.2d 1489 (9th Cir.1984), *vacated on other grounds and remanded,* 469 U.S. 1082, 105 S.Ct. 583, 83 L.Ed.2d 694 (1984) (mem.); *Childress v. Secretary of Health & Human Servs.*, 679 F.2d 623, 630 (6th Cir.1982). The only suggestion to the contrary is *Yellow Taxi Co. v. NLRB*, 721 F.2d 366, 384–85 (D.C.Cir.1983), in which Judge Wright suggested, in a concurring opinion, that the NLRB is "free to decline to follow decisions of the courts of appeals with which it disagrees, even in cases arising in those circuits." *Id.* at 384. But the NLRB's nonacquiescence is not strictly "intracircuit" at all: It occurs because a broad venue statute often forces the agency to act without knowing which circuit court ultimately will review its actions. *See, e.g.,* Coenen, *The Constitutional Case Against Intracircuit Nonacquiescence*, 75 MINN. L.REV. 1339, 1348 (1991). The *Yellow Taxi* case, for example, arose in Minnesota but was reviewed in our Circuit. True intracircuit nonacquiescence, by contrast, occurs when an agency *does* know which court of appeals will review its actions and yet refuses to follow the rulings of the reviewing court. That is precisely what the Railroad Retirement Board has chosen to do in the Eighth Circuit.

There is, of course, some venue uncertainty under the Railroad statute: Mrs. Johnson's case arose in Kentucky and was

appealed to our circuit. But the Board has never attempted to invoke venue uncertainty to justify its actions, and it seems to be asserting a right of nonacquiescence in its most sweeping sense.

Several courts have questioned the constitutionality of intracircuit nonacquiescence with broad references to *Cooper v. Aaron*, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958), and *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). *See, e.g., Stieberger v. Heckler*, 615 F.Supp. 1315, 1356–58 (S.D.N.Y.1985), *prelim. inj. vacated sub nom. Stieberger v. Bowen*, 801 F.2d 29 (2d Cir.1986); *Lopez*, 725 F.2d at 1497 n. 5. But it is not necessary to accept the *Cooper* analogy to criticize the Board's policy in this case. In *Cooper*, the Supreme Court said that its interpretations of the Constitution are binding on state officials, even on those who were not parties to the case or bound by a court order. *Marbury*, according to the *Cooper* Court, "declared the basic principle that the federal judiciary is supreme in the exposition of the law of the Constitution"; therefore, the Court concluded, judicial interpretations of the Constitution are the "supreme law of the land," and state officials are bound by oath to follow them. 358 U.S. at 18, 78 S.Ct. at 1410. Circuit courts, for their part, have compared the nonacquiescence of federal agencies to the defiance of Governor Faubus at Little Rock, noting that "[w]hat the [*Cooper*] Court said with regard to the Constitution applies with full force with regard to federal statutory law." *Lopez*, 725 F.2d at 1497 n. 5.

Defenders of nonacquiescence argue that the *Cooper* analogy is inexact. Although *Cooper* speaks not of the Supreme Court but of "*the federal judiciary* [as] supreme in the exposition of the law of the Constitution*," 358 U.S. at 18, 78 S.Ct. at 1410 (emphasis added), the decision seems to assume that "the law forming the basis for the obligation to acquiesce is no longer in flux." Estreicher & Revesz, 98 YALE L.J. at 725. Supreme Court decisions, the argument goes, should be followed in the interests of national uniformity; but until the Supreme Court has spoken, agencies have argued that their responsibility to formulate "uniform and orderly national policy in adjudications" allows them to refuse to acquiescence in the conflicting views of U.S. Courts of Appeals. *See, e.g., S & H Riggers & Erectors, Inc. v. Occupational Safety & Health Review Comm'n*, 659 F.2d 1273, 1278 (5th Cir. Unit B Oct.1981). At oral argument before this court, similarly, the Railroad Board emphasized its responsibilities as a "nationwide authority." This Board offered no other arguments to defend its policy.

But even if we assume, for the sake of argument, that an interest in national uniformity might justify nonacquiescence in *some* cases, the sincerity of the Railroad Board's interest in uniformity is open to question. When an agency honestly believes a circuit court has misinterpreted the law, there are two places it can go to correct the error: Congress or the Supreme Court. The Railroad Retirement Board has done neither. It has not asked Congress to clarify its intentions, even after two circuits said it had misunderstood Congress's intentions. More remarkably, it has failed to petition the Supreme Court for certiorari, even in the decisions it claims to believe were wrongly decided. The Board appears, as a result, to be less interested in national uniformity than in denying benefits one way or another.

The Board, in the end, can hardly defend its policy of selective nonacquiescence by invoking national uniformity. The policy has precisely the opposite effect, since it results in very different treatment for those who seek and who do not seek judicial review. If a Railroad spouse, like a social security claimant,

> has the determination and the financial and physical strength and lives long enough to make it through the administrative process, he can turn to the courts and ultimately expect them to apply the law as announced [by the Circuit]. If exhaustion overtakes him and he falls somewhere along the road leading to such ultimate relief, the nonacquiescence and the resulting termination stand. Particularly with respect to the types of individuals here concerned, whose re-

sources ... are by definition, relatively limited, such a dual system of law is prejudicial and unfair.

*Lopez v. Heckler,* 572 F.Supp. 26, 28 (C.D.Cal.1983).

Conceding the lack of vertical uniformity—similar treatment of all claimants in the same circuit—defenders of nonacquiescence have tried to point to the benefits of what they call horizontal uniformity—similar treatment of all national claimants in initial agency proceedings. At the same time, they acknowledge that horizontal uniformity is not an end in itself, but a means to other values, such as fairness. *See, e.g.,* Estreicher & Revesz, 98 YALE L.J. at 748. It is a peculiar view of fairness, however, that treats all claimants equally poorly by depriving them of benefits they will eventually receive if they have the fortitude to run an administrative gauntlet. This looks uncomfortably like the frivolous and obstructionistic litigation that the Supreme Court has severely criticized in the context of habeas corpus. *See, e.g., McCleskey v. Zant,* —— U.S. ——, 111 S.Ct. 1454, 1468–69, 113 L.Ed.2d 517 (1991).

Because of the venue provisions of the Railroad Act, furthermore, *any* claimant who is denied Tier I benefits in the future can eventually receive benefits by seeking review in our circuit. *See* 45 U.S.C. § 355(f) (1988). It is hard to see the fairness of a policy that guarantees benefits to those who can afford to appeal in the District of Columbia and denies benefits to those who cannot. Under these circumstances, the interests of both fairness and national uniformity suggest that the Board should consider reinstating Tier I benefits in all jurisdictions.

Ordinarily, of course, the arguments against *inter* circuit nonacquiescence (which occurs when an agency refuses to apply the decision of one circuit to claims that will be reviewed by another circuit) are much less compelling than the arguments against *intra* circuit nonacquiescence. Although the decision of one circuit deserves respect, we have recognized that "it need not be taken by the Board as the law of the land." *Givens v. United States*

*R.R. Retirement Bd.,* 720 F.2d 196, 200 (D.C.Cir.1983). When the Board's position is rejected in one circuit, after all, it should have a reasonable opportunity to persuade other circuits to reach a contrary conclusion. And there is an additional value to letting important legal issues "percolate" throughout the judicial system, so the Supreme Court can have the benefit of different circuit court opinions on the same subject. *See, e.g., United States v. Mendoza,* 464 U.S. 154, 160, 104 S.Ct. 568, 572, 78 L.Ed.2d 379 (1984). But now that three circuits have rejected the Board's position, and not one has accepted it, further resistance would show contempt for the rule of law. After ten years of percolation, it is time for the Board to smell the coffee.

In light of our decision today, we hope that the Board will choose to abandon its policy of intracircuit nonacquiescence, as the Social Security Administration did after being severely criticized by the Courts and by Congress. *See, e.g.,* H.R.CONF.REP. NO. 1039, 98th Cong., 2d Sess. 38 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3038, 3080, 3096. But if the Board persists, we expect that the policy of nonacquiescence itself could be considered a "final decision of the Board" under 45 U.S.C. § 355(f) that could be challenged by a spouse or widow in an appropriate action before this court. *Cf. Bowen v. City of New York,* 476 U.S. 467, 486, 106 S.Ct. 2022, 2033, 90 L.Ed.2d 462 (1985); *Hyatt,* 807 F.2d at 380.

### III. CONCLUSION

We affirm the district court's dismissal of the complaint for lack of jurisdiction. We reverse the Board's order and remand with directions to award Mrs. Johnson a Tier I spouse's annuity for the period which began with the termination of her annuity and which ended when her youngest child turned eighteen.

*It is so ordered.*

BUCKLEY, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's conclusion that the district court lacked jurisdiction over the class action. I dissent, however, from

its rejection of the Railroad Retirement Board's denial of Tier I benefits for Mrs. Johnson. As I find 45 U.S.C. § 231c(a)(1) ambiguous and the Board's interpretation of it permissible, I believe we are obliged to accede to the Board's disposition of her claim. *See Chevron U.S.A. Inc. v. NRDC, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). I also write separately to comment on the majority's discussion of nonacquiescence by federal agencies in circuit court decisions.

## I. BACKGROUND

### A. The Railroad Retirement Act and Social Security

The Railroad Retirement Act ("RRA"), 45 U.S.C. §§ 231 et seq. (1988), is a complex statute. As it has evolved, the Act provides qualified individuals with two categories of sometimes overlapping benefits. The first, known as "Tier I," provides benefits at least equal to those available under the social security system's old age, survivors, and disabled insurance programs. Although there are certain differences between the two systems, Tier I benefits are generally predicated on those available under equivalent provisions of the Social Security Act ("SSA"). *See, e.g., id.* §§ 231b(a)(1), 231c(a)(1), and 231c(f)(1). The RRA also provides a second, "Tier II" category of benefits. These are payable in addition to the first and are calculated on the basis of such factors as length of service and pay. *See id.* § 231b(b); *see also id.* §§ 231c(b), (g).

The change to a two-tiered system was initiated in 1951 with the adoption of major amendments to the RRA. *See* Pub.L. No. 82–234, § 7, 65 Stat. 683, 684–85 (1951). At the same time, Congress established a financial interchange between the railroad retirement and social security systems: The Railroad Retirement Account would thereafter transfer to the social security trust funds the amount that would have been paid into them if the railroad employees had been covered under the SSA; the trust funds, in turn, would transfer to the Railroad Retirement Account the amounts that the railroad beneficiaries would have

drawn from those trust funds if they had been covered by the SSA. *See id.* § 22(b), 65 Stat. at 687–88 (1951) (codified as amended at 45 U.S.C. §§ 231f(c), 231n (1988)).

### B. Ruling Under Review

In May 1989, the Board affirmed and adopted the Appeals Referee's finding that Mrs. Johnson "[was] entitled to tier I as well as tier II after her youngest child attained age 16," but that the provision governing the computation of spousal annuities required that her Tier I payments be "reduced to zero." Decision of the Appeals Referee, Bureau of Hearings and Appeals, U.S. Railroad Retirement Board at 5 (July 12, 1988) ("Appeals Referee Decision"), *reprinted in* Appendix ("App.") at 32. This finding was based on the Board's interpretation of section 4(a)(1) of the RRA, as codified, which provides that "[t]he annuity of a spouse ... [having the care of a child under eighteen] shall be in an amount equal to the amount ... such spouse ... would have been entitled under the Social Security Act."

It was the Board's view that this section required it to determine whether Mrs. Johnson would have qualified for an annuity under that statute. Accordingly, the Board consulted section 202 of the SSA, as codified, which provides that a spouse's right to an annuity is "subject to subsection (s)." 42 U.S.C. § 402(b)(1) (1988). Prior to 1981, subsection (s) enabled a spouse to receive social security benefits for a child under the age of eighteen, the same age specified in the RRA. *See id.* § 402(s)(1) (1976); 45 U.S.C. 231a(d)(1)(iii) (1976). In 1981, however, Congress amended subsection (s) to cut off child-related social security benefits at the age of sixteen. *See* Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97–35, § 2205(a)(1), 95 Stat. 357, 837 (1981) ("1981 Budget Act"); *see also* 42 U.S.C. § 402(s)(1) (1988). As a consequence, the Board concluded that although the RRA authorized a Tier I annuity for a child up to the age of eighteen, the amount payable for one who had reached sixteen was zero. *See* Appeals

Referee Decision at 4, *reprinted in* App. at 31.

## II. APPLICABILITY OF *CHEVRON*

*Chevron* holds that when a provision of an agency's organic statute is ambiguous with respect to a particular issue, a court must defer to the agency's interpretation of the provision so long as it "is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782. The majority and the courts in *Costello v. United States R.R. Retirement Bd.*, 780 F.2d 1352 (8th Cir.1985), and *Johnson v. United States R.R. Retirement Bd.*, 925 F.2d 1374 (11th Cir.1991), maintain that the Board is owed no deference because, in their view, it wandered off its own reservation when it reached its conclusion that Mrs. Johnson was not entitled to receive Tier I benefits for the care of her sixteen-year-old stepdaughter.

In the words of *Costello*, which are echoed in *Johnson*,

> the Board interpreted both the Railroad Retirement Act and the Social Security Act, and considered their interrelationship. Thus, the Board was dealing with matters not totally within its area of expertise.

*Costello*, 780 F.2d at 1354; *see also Johnson*, 925 F.2d at 1378 (same). With great respect, this is equivalent to a finding that the Internal Revenue Service's interpretation of a tax indexation provision is not owed deference because the Internal Revenue Code requires reference to the Bureau of Labor Statistics' Cost of Living Index, as to which the IRS has no expertise. Here, the nature of the relationship between the Railroad Retirement and Social Security Acts is defined entirely by the former; the latter only determines the dollar amount that a Tier I spousal annuitant is to receive. Where one is to look in the SSA in order to identify that amount depends exclusively on how one construes section 4(a)(1) of the RRA. Once that is decided, the computation of the amount payable is a simple matter. It takes no expertise in social security law to determine what a spousal annuitant will receive

under the SSA, or that section 202(s) of the SSA, as amended by the 1981 Budget Act, reads "16" rather than "18."

In a similar vein, the majority tries to avoid the mandate of *Chevron* by constructing a straw man. It does so by positing a question that the Board, in interpreting an unamended RRA, saw no need to ask and therefore did not answer; namely, "whether Congress [when it amended the SSA] intended spousal annuitants under the Railroad Act, like the Social Security Act, to lose their benefits once their children turn sixteen." Maj.Op. at 1087. The majority then seizes upon an isolated statement in the Board's brief—" 'Congress ... did not need to amend the [Railroad] Act because it knew section[ ] 4(a)(1) [section 231c(a)(1) as codified] ... would incorporate any changes' in the Social Security Act," *id.* at 1089 (quoting Brief for Respondent at 45)—to declare that the Board's position is premised on its understanding of Congress's intent when it amended the SSA.

The problems with this conclusion are manifest. As in the ruling under review, *see* Appeals Referee Decision at 4–6, *reprinted in* J.A. at 31–33, the Board does in fact justify its decision on the basis of the Railroad Act alone. *See* Brief for Respondent at 25 ("II. TERMINATION OF MS. JOHNSON'S TIER I ANNUITY COMPONENT IS A PERMISSIBLE INTERPRETATION OF Section 4(a)(1) [45 U.S.C. § 230c(a)(1) ]"); *id.* at 27–31 (text of RRA supports Board's interpretation of the RRA); *id.* at 31–34 (statutory structure of RRA supports same); *id.* at 34–41 (legislative history of RRA supports same).

Moreover, the Board's statutory argument is in no sense premised on the statement quoted by the majority. That statement appears in a separate section of the Board's brief, Part III, that is devoted to a rebuttal of arguments advanced in *Costello* and *Johnson*. The courts in those cases contended that as Congress had failed, when it amended the SSA, to enact a parallel age reduction in the RRA, Congress must have intended that the Tier I benefits remain payable until a child reached the

age of eighteen. It was in response to this contention that the Board stated: "Both courts miss the point; Congress did not need to amend the Act because it knew section 4(a)(1) ... would incorporate any changes." Brief for Respondent at 45. Nothing in this statement suggests that the Board premised its interpretation of the RRA on its assumption that Congress was aware of the consequences of its later amendment of the SSA. As the Board noted in the preceding paragraph, "*Costello* and *Johnson* notwithstanding, ... this is clearly an interpretation of the RRA." *Id.*

As the agency in fact based its case on its interpretation of section 231c(a)(1), *Chevron* applies. Our inquiry, then, must turn to whether that section is ambiguous; and if so, whether the Board's construction is permissible. The provision reads, in substantial part, as follows:

> The annuity of a spouse ... of an individual under section 231a(c) of this title shall be in an amount equal to the amount ... of the wife's insurance benefit or the husband's insurance benefit to which such spouse ... would have been entitled under the Social Security Act ... if such individual's service as an employee after December 31, 1936, had been included in the term "employment" as defined in that Act.

45 U.S.C. § 231c(a)(1). The *Costello* and *Johnson* courts take the position that the section establishes "two distinct steps" for the determination of the amount that is to be paid a caretaker spouse under Tier I:

> The threshold question is whether a claimant is entitled to an annuity. For this first question, one refers to the entitlement section of the appropriate act.... If, under either [the RRA or SSA], entitlement exists, *the second step is to refer to the social security regulations to determine the amount of benefits.*

*Costello*, 780 F.2d at 1355 (emphasis added); *see also Johnson*, 925 F.2d at 1377 (citing *Costello*). The Board has a very different view of the statute. It concludes that the amount Mrs. Johnson may be paid under the RRA is that amount to which she would have been entitled if her husband's employment had been credited under the SSA and she had applied for a benefit thereunder.

As both of these interpretations are tenable, it seems clear enough that the section is ambiguous. The majority agrees. *See* Maj.Op. at 1089 ("There is no evidence that Congress 'spoke directly to the precise question at issue' under step one."). That being the case, we must determine whether the Board's construction is "rational and consistent with the statute." *NLRB v. United Food & Commercial Workers Union, Local 23, AFL–CIO,* 484 U.S. 112, 123, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987). There can be no question that the language of section 231c(a)(1) is susceptible to the Board's interpretation. The Supreme Court reminds us, however, that in construing a particular provision, a court must look to "the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988). I believe the Board's interpretation meets this test. It is fully consistent with the statute's two-tiered structure and with the financial interrelationship that exists between the railroad retirement and social security systems.

When Congress restructured the RRA, it established a substantial parity between Tier I benefits and those available under the social security system's old age, survivors, and disabled insurance programs. Moreover, it created a mechanism that results in the use of social security trust funds to pay Tier I annuities. One consequence of this arrangement is that to the extent that Tier I benefits exceed those payable under the social security system, any shortfalls must be met out of funds that are earmarked for the payment of Tier II benefits. The 1981 Budget Act changed neither the text nor the meaning of section 231c(a)(1). Under the Board's reading of the section, the parity in benefits under the two systems is maintained, and the financial problem that would result from a disparity between Tier I and SSA spousal benefits is avoided. In sum, there was simply no reason for the Board to conclude

that Congress had decided, in 1981, to sever the link it had earlier forged between the two systems.

The majority and the *Costello* and *Johnson* courts nevertheless insist that if Congress had intended to reduce the RRA benefits in 1981, it would have said so explicitly. *See* Maj.Op. at 1089; *Costello*, 780 F.2d at 1355; *Johnson*, 925 F.2d at 1379. Given the structure of the RRA and its linkage to the SSA, I think it just as reasonable to suggest that if Congress had intended to de-link the two systems and maintain Tier I payments at the pre–1981 level, it would not only have said so, it would have provided for their funding. In the absence of any expression of a congressional intent to change the relationship between Tier I and social security spousal benefits, it is hardly surprising that the Board should apply the RRA as it was written.

The majority's attempt to buttress its argument by reference to section 231r of the RRA is equally unavailing. As the majority notes, this section of the Act provides that any action taken by Congress to increase social security benefits or eligibility shall be "automatically applicable" to railroad retirement annuity claimants. Maj.Op. at 15. It says nothing, however, about legislation that tightens eligibility or reduces benefits. This is not surprising, as the provision was enacted in 1974 when amendments to the SSA had historically increased eligibility. *See* Pub.L. No. 93–445, § 101, 88 Stat. 1305, 1350 (1974); *see also* H.Rep. No. 1345, 93rd Cong., 2d Sess. 8–9 (1974) (discussing recent "liberalizations in eligibility requirements for social security benefits"); S.Rep. No. 1163, 93rd Cong., 2d Sess. 8–9 (1974), 1974 U.S.C.C.A.N. 5702 (same). At most, section 231r gives rise to a statutory ambiguity that, under *Chevron*, is for the agency to resolve. As it is, the majority engages in sheer speculation when it concludes that Congress, in enacting section 231r, intended that "an explicit authorization is necessary to reduce Railroad annuities." Maj.Op. at 1089.

The majority claims, finally, that because the Board reversed its treatment of *Tier II* payments with respect to certain *survivor's* annuities (it had denied them to the petitioner-survivor in *Costello*), it would be "hard pressed to sustain the Board's interpretation as 'reasonable.'" Maj.Op. at 1089. This claim can be dealt with summarily. This case is about a *spouse's Tier I* benefits. Whatever the logic or illogic of the Board's treatment of Tier II benefits for survivors, that issue is not before us. *See* Brief for Petitioner at 35 n. 13.

### III. Nonacquiescence

Although dicta, the majority's discussion of agency nonacquiescence suggests that we may be prepared to draw some rather hard lines on the matter. While I share the majority's exasperation with the Board's refusal to apply the *Costello* ruling to claims arising within the Eighth Circuit, there are circumstances where intracircuit nonacquiescence may be justified. *See* Estreicher & Revesz, *Nonacquiescence by Federal Administrative Agencies*, 98 Yale L.J. 679, 743–53 (1989). In this instance, I can see no extenuating circumstances, especially in light of the bureaucratic obstacles a claimant must overcome before she can petition for judicial review. Nevertheless, I would not want us to leave the impression that this court will find intracircuit nonacquiescence unacceptable under any and every circumstance.

Nor should we suggest a rigid rule of "three strikes and out," as the majority does in the case of intercircuit nonacquiescence. *See* Maj.Op. at 1093. It is easy enough to say that when an agency is reversed on an important issue, its proper course is to appeal to Congress or the Supreme Court. Catching Congress's ear, however, is more easily said than done; and given the huge volume of petitions for certiorari that flood the Supreme Court, it is often necessary to establish a split among the circuits before the Court will examine an issue. If an agency is confident enough of its own position, I would be reluctant to establish an arbitrary limit on

the intercircuit waters it would be allowed to test.