# Proposed Agency Interpretation of "Federal Means-Tested Public Benefit[s]" Under Personal Responsibility and Work Opportunity Reconciliation Act of 1996

The interpretation of the phrase "federal means-tested public benefit[s]" in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 proffered by the Departments of Health and Human Services and Housing and Urban Development — that it applies only to mandatory (and not discretionary) spending programs — constitutes a permissible and legally binding construction of the statute.

January 14, 1997

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF HEALTH AND HUMAN SERVICES

You have requested the views of the Office of Legal Counsel regarding a construction, proffered by the Departments of Health and Human Services ("HHS") and Housing and Urban Development ("HUD"), of the scope of the phrase "federal means-tested public benefit[s]" contained in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRA" or "Act").[1] In particular, HHS and HUD have concluded that this phrase is best construed to apply only to mandatory (and not discretionary) spending programs.[2] Both departments have determined that this construction of the PRA "best balances [their] other statutory obligations with Congressional goals embodied in the [PRA]."[3] We further understand that the Departments of Agriculture, Education, Labor and Veterans Affairs and the Social Security Administration all concur in, or defer to, the HHS and HUD proffered interpretation of the PRA.[4]

As explained more fully below, we believe that the proffered interpretation is a permissible construction of the statute. The PRA was enacted as a budget reconciliation bill, and, accordingly, must be construed against the backdrop of the Congressional Budget Act of 1974 ("CBA").[5] Under the CBA, budget reconciliation legislation is subject to expedited procedures in both the Senate and the House. To counterbalance these expedited procedures, the CBA permits a member of the Senate to raise a point of order against any material included in the legislation that is extraneous to the budget reconciliation process. Here, through application of this procedure, a broad definition of the phrase "federal means-tested

---

[1] Pub L No 104–193, 110 Stat 2105

[2] See Letter for Christopher H Schroeder, Acting Assistant Attorney General, Office of Legal Counsel, from Harriet S Rabb, General Counsel, Department of Health and Human Services (Dec. 13, 1996) ("Rabb Request")

[3] See, e g., Letter for Arthur Fried, General Counsel, Social Security Administration, from Harriet S Rabb, General Counsel, Department of Health and Human Services and Nelson A Diaz, General Counsel, Department of Housing and Urban Development (Nov 21, 1996) ("Rabb/Diaz Letter")

[4] Rabb Request at 1 Since receiving your letter of December 13, 1996, we have received oral advice from your office that the Social Security Administration concurs in the proffered definition

[5] Pub L. No 93–344, 88 Stat 297 (1974) (codified as amended in scattered sections of 2 U.S.C).

21

public benefit'' was struck from early versions of the bill that ultimately became the PRA. Significantly, the broad definition was struck because it reached discretionary spending programs, which, in this context, lay beyond the proper scope of the reconciliation process.

In light of this history, and the absence of a sufficiently clear indication that Congress intended, notwithstanding the CBA, to reach discretionary spending programs, we conclude that the meaning of the phrase ''federal means-tested public benefit'' is, at the very least, ambiguous. We further conclude that the HHS/HUD proffered definition is a reasonable construction of the statute, that the agency interpretation is entitled to judicial deference, and that, accordingly, the proffered definition should govern.

## DISCUSSION

Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 110 Stat. at 2260, imposes various restrictions on aliens' eligibility for public benefits in the United States. A number of provisions in title IV establish restrictions with respect to aliens' receipt of ''federal means-tested public benefit[s].'' These restrictions fall into three general categories: (1) provisions that deny ''federal means-tested public benefit[s]'' to qualified aliens for the first five years after their entry into the United States;[6] (2) provisions that require certain groups of aliens who seek federal and state public benefits to prove that they can be credited with 40 qualifying quarters of work under title II of the Social Security Act (''SSA'') and have not received any ''federal means-tested public benefit'' during any of those quarters;[7] and (3) provisions that establish and define sponsor-to-alien deeming rules to be applied to aliens seeking ''federal means-tested public benefit[s].''[8]

The PRA contains no statutory definition of the phrase ''federal means-tested public benefit.'' HHS and HUD, however, have concluded that the restrictions on federal means-tested public benefits contained in title IV should apply only to mandatory spending programs, i.e. programs for which funding is not subject to a definite appropriation.[9] Under this construction of the Act, for example, newly arrived qualified aliens would be ineligible for benefits under mandatory programs for the first five years after their arrival in this country, but they would remain eligible for benefits under discretionary spending programs. The rationale of HHS and HUD for this approach is that ''affected departments should hesitate to apply

---

[6] *See* § 403(a) & (c), 110 Stat. at 2265–66.

[7] *See* §§ 402(a)(2)(B)(ii)(II), 402(b)(2)(B)(ii)(II), 412(b)(2)(B)(ii), 435; 110 Stat. at 2262–63, 2264–65, 2269, 2275–76.

[8] *See* § 421(a), (b)(2)(B), (c), (d), 110 Stat. at 2270–71.

[9] While we have not been provided with a comprehensive list of which programs would be subject to these title IV restrictions under the HHS/HUD interpretation, we understand that Medicaid, food stamps, Supplemental Security Income (''SSI''), and Temporary Assistance for Needy Families (''TANF'') are included within the mandatory category.

the term 'federal means-tested public benefit' broadly in a manner that would
deny qualified aliens more benefits than Congress may have clearly intended.''
Rabb/Diaz Letter, attachment at 4. HHS and HUD assert that ''this reading of
the term best balances our Departments' other statutory obligations with Congres-
sional goals embodied in [the PRA],'' Rabb/Diaz Letter at 1, and that ''sound
legal and policy considerations support a conclusion that the term is limited to
means-tested mandatory spending programs.'' Rabb/Diaz Letter, attachment at 1.

In evaluating the construction proposed by HHS and HUD, we are guided by
the Supreme Court's landmark opinion, *Chevron U.S.A. v. Natural Resources
Defense Council, Inc.*, 467 U.S. 837 (1984), which explains the proper approach
for reviewing the construction of statutes by the agencies that administer them.
The first step in the *Chevron* analysis is to determine ''whether Congress has
directly spoken to the precise question at issue.'' 467 U.S. at 842. If congressional
meaning, as discerned through ''traditional tools of statutory construction,'' *id.*
at 843 n.9, is clear, then no further inquiry is necessary, for the ''unambiguously
expressed intent of Congress'' must control. *Id.* at 843. *See also United States
v. Alaska*, 503 U.S. 569, 575 (1992). If the statute is silent or ambiguous with
respect to the issue posed, then, under the second step in the *Chevron* analysis,
the questions become whether Congress has implicitly or explicitly delegated to
the agency the authority to resolve the ambiguity and, if so, whether ''the agency's
answer is based on a permissible construction of the statute.'' *Chevron*, 467 U.S.
at 843. *See also Alaska*, 503 U.S. at 575.

## I. *Chevron Step I*

The starting point in determining whether ''Congress had an intention on the
precise question at issue,'' *Chevron*, 467 U.S. at 843 n.9, is, of course, the lan-
guage of the statute itself. *See Kaiser Aluminum & Chem. Corp. v. Bonjorno*,
494 U.S. 827, 835 (1990); *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*,
447 U.S. 102, 108 (1980). Ordinarily, if the terms of the statute are plain, they
control and that is the end of the matter. *See Chevron*, 467 U.S. at 843; *Holly
Farms Corp. v. NLRB*, 517 U.S. 392, 398 (1996).

At the same time, it is well-established that a provision in one act of Congress
should be read in conjunction with other relevant statutory provisions and not
in isolation. *See Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 712–13, 722–
36 (1989); *id.* at 738–39 (Scalia, J., concurring in part and concurring in the judg-
ment); *see also Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995). Thus, courts
regularly construe statutory language in light of both other provisions of the same
law and relevant provisions from other laws. *See, e.g., Quackenbush v. Allstate
Ins. Co.*, 517 U.S. 706, 711–12 (1996); *Sullivan v. Everhart*, 494 U.S. 83, 92
(1990); *cf. Sullivan v. Finkelstein*, 496 U.S. 617, 632 (1990) (Scalia, J., concur-
ring) (meaning of later enacted statute may affect interpretation of ''previously

23

enacted statute, since statutes *in pari materia* should be interpreted harmoniously"). The fact that different statutory provisions may employ similar terms in varying contexts, for example, may give insight as to the meaning of the term in the particular context that is under review. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 487–89 (1996) (plurality opinion). Similarly, the possibility that the adoption of a seemingly plain statutory meaning may cause a direct conflict with a different statutory provision, even if in a different law, may trigger application of the presumption against repeals by implication. *See Watt v. Alaska*, 451 U.S. 259, 266 (1981); *FAA v. Robertson*, 422 U.S. 255, 263 (1975); *Silver v. New York Stock Exchange*, 373 U.S. 341, 357 (1963). Moreover, courts commonly rely upon a general interpretive statute, the Dictionary Act, 1 U.S.C. § 1, in construing specific statutory language that, but for the otherwise-codified definitional provision, might suggest a different meaning. *See Rowland v. California Men's Colony*, 506 U.S. 194, 199–200, 209–10 (1993); *id.* at 212–13, 222 (Thomas, J., dissenting); *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 666 (1979); *United States v. A & P Trucking Co.*, 358 U.S. 121, 123 (1958).

The general rule that the meaning of particular statutory provisions should be determined with reference to the broader legislative landscape provides significant guidance here. As reconciliation legislation, the PRA must be interpreted in the context of both the Congressional Budget Act of 1974, which establishes general rules that govern the enactment of budget reconciliation measures, and congressional actions taken pursuant to that statutory regime. Just as courts, when considering a term that has been defined in the Dictionary Act, read that term in light of the Dictionary Act definition, so too, here, the rules set forth in the CBA provide important guidance in discerning the meaning of the relevant provisions of the PRA.

## A.

The PRA was brought to the floor of the Senate as a reconciliation bill, and as such was subject to the special rules that govern the reconciliation process set forth in section 313 of the CBA. *See* 2 U.S.C. § 644 (1994); Robert Keith & Edward Davis, *The Senate's "Byrd Rule" Against Extraneous Matter in Reconciliation Measures* 1–2 (Congressional Research Service 1995). Section 313 serves to facilitate the expedited consideration of reconciliation legislation by providing a mechanism for restricting the content of such legislation to provisions that are material to the reconciliation process. *See* Allen Schick, *The Federal Budget: Politics, Policy, Process* 82–86 (1995). Over time, these subject matter restrictions have become known as the "Byrd rule," after Senator Robert Byrd of West Virginia, their principal proponent. The basic purpose of the Byrd rule is twofold: to protect the effectiveness of the reconciliation process by excluding extraneous material that has no significant budgetary effect, and to preserve the

deliberative character of the Senate by exempting from expedited consideration all legislative matters that should properly be debated under regular procedures.[10]

Section 313 establishes the general framework that governs the nation's budgeting process and shapes the content of the legislation that Congress enacts through the reconciliation process. Indeed, the Byrd rule has been deemed sufficiently important to the fashioning of the nation's budget that it is not merely an internal rule of Senate procedure but, as we have noted, a statute duly passed by both houses of Congress and signed by the President. The meaning of a particular provision of reconciliation legislation, therefore, such as the phrase "federal means-tested public benefit" in the PRA, must be construed in light of congressional actions taken pursuant to the CBA.

Specifically, the CBA provides:

> When the Senate is considering a reconciliation bill or a reconciliation resolution . . . upon a point of order being made by any Senator against material extraneous to the instructions to a committee which is contained in any title or provision of the bill or resolution or offered as an amendment to the bill or resolution, and the point of order is sustained by the Chair, any part of said title or provision that contains material extraneous to the instructions to said Committee as defined in subsection (b) of this section shall be deemed stricken from the bill and may not be offered as an amendment from the floor.

Pub. L. No. 93–344, tit. III, § 313 (codified at 2 U.S.C. § 644(a)). Section 313(b)(1) outlines six categories of "extraneous" provisions, the most significant of which, for purposes of this analysis, is (b)(1)(D), which states that a provision shall be considered extraneous "if it produces changes in outlays or revenues which are merely incidental to the non-budgetary components of the provision." 2 U.S.C. § 644(b)(1)(D). The rule, as set forth in section 313, is enforced by a Senator raising a point of order against some provision or provisions of the bill, on the ground that that provision deals with subject matters extraneous to the legislation.

---

[10] The Byrd rule was adopted in 1986, following years of struggle on the Senate floor over the inclusion of extraneous provisions in budget reconciliation legislation. Originally enacted as section 20001 of the Consolidated Omnibus Budget Reconciliation Act of 1985, Pub L. No. 99–272, § 20001, 100 Stat 82, 390–91 (1986), it was, in 1990, incorporated as section 313 of the Congressional Budget Act of 1974 *See* Budget Enforcement Act of 1990, *enacted as* Title XIII of Omnibus Budget Reconciliation Act of 1990, Pub. L No. 101–508, § 13214(b)(1), 104 Stat 1388, 1388–622. As Senator Byrd explained in introducing the amendment that ultimately bore his name:

> Mr President, the Senate is a deliberative body, and the reconciliation process is not a deliberative process . . . Such an extraordinary process, if abused, could destroy the Senate's deliberative nature Senate committees are creatures of the Senate, and, as such, should not be in the position of dictating to the Senate as is being done here By including mater[i]al not in their jurisdiction or matter which they choose not to report as separate legislation to avail themselves of the nondeliberative reconciliation process, Senate committees violate the compact which created both them and the reconciliation process

131 Cong. Rec. 28,968 (1985)

The PRA's original definition of "federal means-tested public benefit," contained in both the Senate and House bills, encompassed an expansive range of benefit and assistance programs and did not distinguish between those that were mandatory and those that were discretionary. When the Senate bill reached the floor, Senator Exon invoked the Byrd rule to raise an omnibus point of order against a number of provisions of the legislation, including the definition of "federal means-tested public benefit." 142 Cong. Rec. 18,296–97 (1996). His objection to this provision was based upon section 313(b)(1)(C) of the CBA, i.e. the provision was not within the Finance Committee's jurisdiction. *Id.* at 18,297.

The Parliamentarian upheld Senator Exon's Byrd rule objection on the grounds that the provision was outside the Finance Committee's jurisdiction and that, to the extent the definition encompassed discretionary programs, its impact on the budget was "merely incidental." [11] Rules determining eligibility for discretionary program benefits within a reconciliation bill have no direct effect on the budget. Rather, reducing the size of a discretionary program is accomplished by Congress reducing the appropriation for the program, which the proposed definition of "federal means-tested public benefit" did not do. By contrast, so-called entitlement, or mandatory, programs, generally operate under indefinite appropriations; the size of the program is not determined based on a fixed appropriation, but rather on expenditures incurred for all eligible program participants. Thus expenditures under mandatory programs can be directly reduced by restricting eligibility and thereby reducing the number of people receiving benefits.

The ruling sustaining Senator Exon's objection was not appealed by any other Senator. As a result, the definition of "federal means-tested public benefit" was struck from the Senate bill. Moreover, the House acceded to the Senate deletion and agreed to remove its own expansive definition of the term "federal means-tested public benefit" in conference. The conference committee acknowledged the deletion of the definition under the Byrd rule. 142 Cong. Rec. 20,484 (1996).

This legislative record provides strong evidence that the phrase "federal means-tested public benefit[s]," as used in the PRA, should be construed to reach only mandatory (and not discretionary) spending programs. In keeping with section 313, a Byrd rule objection was made and sustained, a definition was dropped from the bill in response to the objection, and the House acceded to the Senate version of the bill in light of the Byrd rule objection. To ignore these events

---

[11] The Parliamentarian upheld the objection on the basis of both sections 313(b)(1)(C) (not within Finance Committee's jurisdiction) and 313(b)(1)(D) (prohibition against policy changes with "merely incidental" budgetary impact). *See* 142 Cong Rec 20,975 (1996) (statement of Senator Graham during consideration of conference report on H R. 3734), *see also id* at 20,979 (statement of Senator Chafee) Although Senator Exon's specific objection to the definition, as itemized in his list, was jurisdictional only, he raised that objection in an omnibus point of order based generally upon section 313(b)(1), which permitted the Parliamentarian to consider any basis under (b)(1) for upholding the objection In any event, in this case it ultimately makes no difference to the analysis whether Senator Exon's objection was sustained on jurisdictional grounds alone or on both grounds because any jurisdictional objection under section 313 is based upon the fact that the Senate committee considering a reconciliation bill would only have jurisdiction over mandatory programs. *See* Schick, *The Federal Budget* 83 (1995) (under current practice, "reconciliation instructions are given only to committees that have jurisdiction over revenues or direct (mandatory) spending programs"). Thus, the underlying reasoning for objections under (b)(1)(C) and (b)(1)(D) is the same.

in determining the meaning of the phrase "federal means-tested public benefit" would be to disregard the purpose and language of section 313 itself, which serves to facilitate the budgeting process by providing a mechanism by which the scope of reconciliation legislation may be contained.[12]

## B.

Several aspects of the text and legislative history of the PRA, when viewed in isolation, arguably support a broad interpretation of "federal means-tested public benefit" that would include discretionary programs. Ultimately, however, we find little evidence that Congress, in passing the final version of the bill, intended to reintroduce the very definition that had been struck through the operation of section 313 of the CBA. What evidence does exist is at best ambiguous, and thus, in our view, does not foreclose HHS and HUD, two of the agencies charged with administering the Act, from construing the PRA in the manner that they propose.

As previously noted, the PRA, as enacted, contains no definition of the phrase "federal means-tested public benefit." Had Congress intended for this phrase to include discretionary spending programs, over the sustained objection of a member of the Senate, it could have reinserted the deleted definition or similar language in the final version. Indeed, the conference committee did reintroduce a number of other provisions that also had been struck from the Senate bill through Senator Exon's omnibus Byrd rule objection, and Congress ultimately voted to retain these provisions in the final version of the PRA. *See* § 816, 110 Stat. at 2318 (caretaker exemption; originally § 1126 of S. 1956, 104th Cong. (1996)); § 838, *id.* at 2331 (expedited coupon service; originally § 1148 of S. 1956; § 850, *id.* at 2336–37 (waiver authority; originally § 1159 of S. 1956); § 729(d), *id.* at 2303 (WIC program/drug abuse; originally § 1259(d)(1) of S. 1956); § 912, *id.* at 2353–54 (abstinence education; originally § 2909 of S. 1956); *compare with* S. 1956 (July 16, 1996 and July 24, 1996 versions). The decision of the conference not to reintroduce the deleted definition of "federal means-tested public benefit" leaves

---

[12] Some language in one appellate decision might be read to suggest that courts should distinguish between procedural and substantive legislative motivations in inferring congressional intent. *See Elizabeth Blackwell Health Ctr. for Women v. Knoll*, 61 F 3d 170, 180 (3d Cir. 1995), *cert denied*, 516 U S 1093 (1996) The appellees in *Elizabeth Blackwell Health Center* argued that Congress, by using a rule of House parliamentary procedure to eliminate a provision in the 1994 Hyde Amendment requiring victims of rape or incest to report the crime to the police prior to seeking publicly funded abortions, intended to prohibit state statutes imposing such reporting requirements. The Third Circuit rejected that argument stating that, "[a]t most, the rejection [of the provision] is a sign that Congress did not wish to mandate reporting requirements on the states," and that Congress's rejection of mandatory reporting requirements "on procedural grounds provides no basis for any inference regarding Congress's views about the substantive provisions of the legislation " 61 F.3d at 180 Unlike here, the procedural objection made in *Elizabeth Blackwell Health Center* did not in any way suggest that Congress intended the specific interpretation offered in that case. The procedural objection raised to the reporting provision was based upon a House rule of parliamentary procedure that prohibited attempts to "legislate" on an appropriations bill. *Id* at 174 The basis for this objection bore no relationship to the substantive interpretation appellees urged. In contrast, here the definition proffered by HHS and HUD is based upon a budgetary distinction between mandatory and discretionary programs, precisely the same basis upon which Senator Exon's Byrd rule objection was made

27

the PRA without the most obvious textual guidance that Congress might have provided had it wished to adopt the previously stricken definition.

The PRA does, however, define the related phrase ''federal public benefit'' broadly, and in a manner that appears to draw no distinction between mandatory and discretionary programs.[13] The phrase ''means-tested,'' moreover, though not defined in the statute, is defined in the dictionary.[14] It could be argued that these two phrases combine to produce a phrase that is sufficiently plain to make clear that, in enacting the bill, Congress effectively overruled the prior Byrd rule deletions.

Although not entirely without force, we find this argument inconclusive. First, even assuming that the phrases ''federal public benefit'' and ''means-tested'' are free of ambiguity, the proposition that combining plain terms necessarily results in an equally plain phrase is not at all self-evident.[15] *See, e.g., Smiley v. Citibank,* 517 U.S. 735, 746–47 (1996). It is not clear, therefore, that, even ignoring the deletion of the broad definition pursuant to the CBA, the bill's final language is so free from ambiguity as to be deemed plain.

More important, as we have explained, the PRA was enacted as reconciliation legislation, and thus can be understood only in light of the special rules that Congress set forth in the CBA and the congressional action taken pursuant to those

---

[13] Section 401(c)(1) defines ''federal public benefit'' as

     (A) any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States, and

     (B) any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States

110 Stat at 2262

[14] The dictionary defines ''means test'' as ''any examination of the financial state of a person as a condition precedent to receiving social insurance, public assistance benefits, or other payments from public funds,'' *Webster's Third New International Dictionary* 1399 (3d ed 1986) *See also Random House Dictionary of the English Language* 1192 (2d ed 1987) (''means test'' is ''an investigation into the financial position of a person applying for aid from public funds'') Despite this definition, precisely what constitutes a ''means test'' in the context of federal programs that distribute benefits on the basis of need is not clear Some federal programs look to both an applicant's income *and* his or her resources to determine eligibility *See, e g,* Medicaid program, 42 U S C. §§ 1396–1396v (1994 & Supp II 1996), Supplemental Security Income program, 42 U S C. §§ 1381–1381a (1994), Food Stamp program, 7 U S.C §§ 2011–2032 (1994 & Supp II 1996) Others look *only* to income without any inquiry into resources. *See, e g,* National School Lunch program, 42 U S C §§ 1751–1769h (1994 & Supp II 1996); Women, Infants & Children program, 42 U S.C § 1786 (1994 & Supp II 1996) Still others presume need on the basis of area of residence, enrollment in another welfare program, or some other factor *See, e.g.,* Indian health services, 42 C F R. § 36 12 (eligibility based upon area of residence), Commodity Supplemental Food Program, 7 U S C. § 612c note (1994) (eligibility based upon enrollment in another government benefit program for low-income persons), Chapter 1 migrant education program, 20 U S.C. § 6398 (1994) (presumption of need for migrant children)

[15] An unrelated provision of the PRA itself hints at the ambiguity of the phrase ''federal means-tested public benefit '' Section 911 of the PRA ensures that individuals whose benefits have been reduced because of an act of fraud by the individual may not receive increased benefits under ''any other means-tested welfare or public assistance program for which Federal funds are appropriated'' as a result of such reduction. § 911(a), 110 Stat. at 2353. The provision then defines the phrase ''means-tested welfare or public assistance program for which Federal funds are appropriated'' to include ''the food stamp program    , any program of public or assisted housing under title I of the United States Housing Act of 1937   ., and any State program funded under part A of title IV of the Social Security Act.'' § 911(b), 110 Stat at 2353 The provision does not state whether these programs are intended to be exhaustive or exemplary, but, in any event, the fact that Congress concluded that it was necessary to provide a definition of some sort suggests that Congress did not believe that the meaning of the defined phrase was plain.

rules. Therefore, the critical question is not whether the phrase "federal means-tested public benefit" is plain when read in isolation, but rather whether the phrase reveals that Congress intended to incorporate the definition that the Senate had deleted, with the House's acquiescence, as a consequence of its compliance with the budgetary rules established by section 313. The PRA's definition of "federal public benefit" does not reveal such an intention. That same definition was already in the bill at the time Senator Exon raised his point of order objecting to the definition of "federal means-tested public benefit." Its inclusion in the final bill, therefore, cannot reasonably be viewed as a rejoinder to Senator Exon's objection.

Moreover, even apart from the operation of section 313, it is a well-settled canon of interpretation that "where the final version of a statute deletes language contained in an earlier draft, [it may be presumed] that the earlier draft is inconsistent with ultimate congressional intentions." *In re Town & Country Home Nursing Servs., Inc.*, 963 F.2d 1146, 1153 (9th Cir. 1991); *see also Russello v. United States*, 464 U.S. 16, 23–24 (1983); *Gulf. Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 200 (1974) (Congress's deletion of provision "strongly militates against a judgment that Congress intended a result that it expressly declined to enact"); *cf. INS v. Cardoza-Fonseca*, 480 U.S. 421, 442–43 (1987) (" 'Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language.' ") (citations omitted). That canon surely applies with particular force in a context such as this, in which the deletion occurs by reason of an independent congressional statute that governs the nation's budgeting process.

A second textual argument that could be made in support of a broader definition arises from the list of exceptions to "federal means-tested public benefit" programs in section 403(c)(2) of the PRA. The inclusion of some discretionary programs in this list of exceptions would be unnecessary unless the term itself included such programs. As an initial matter, we note that the logic of this argument proves *too much*, particularly in light of other drafting flaws that appear in the Act. The same provision that excepts certain discretionary programs from the limitation on eligibility for "federal means-tested public benefit[s]," for example, also excepts certain programs specified by the Attorney General that are not conditioned on "the individual recipient's income or resources." § 403(c)(2)(G), 110 Stat. at 2266. The view that Congress would not have excepted a program that was not otherwise covered would erroneously suggest that "means-tested" must be a more expansive term than the phrase "condition[ed] . . . on the individual recipient's income or resources."

More to the point, the list of exceptions included in section 403(c)(2) is quite plausibly understood as an inconsistency resulting from the proper operation of the Byrd rule itself. The remedy provided in section 313 is a blunt instrument

offering a basis for striking extraneous material in a reconciliation bill, but no mechanism for re-drafting remaining legislative provisions to conform them to the legislation as revised by application of the Byrd rule. Indeed, there was no careful mark-up of the bill following the deletion of the definition of "federal means-tested public benefit," where inconsistent provisions might have been brought into conformity.[16]

Moreover, it is unlikely that members of Congress would have seen the list of exceptions as obviously inconsistent with the PRA as revised by application of the Byrd rule. The categorization of particular programs as mandatory or discretionary is not at all obvious, and it is likely that many, if not most, members did not know precisely which programs fell into which category.[17] In addition, the list of exceptions can be seen as Congress's attempt to safeguard certain programs from any definitional skirmishes and ensure their exception.[18]

We are also unpersuaded that the legislative history of the PRA supports the conclusion that Congress intended to enact extraneous material through the reconciliation process over the sustained objection of a member of the Senate. Although noting that the definition of "federal means-tested public benefit" was deleted from the bill through operation of section 313, the conferees' report on the PRA nonetheless asserts that "[i]t is the intent of the conferees that [the deleted] definition be presumed to be in place for purposes of this title." 142 Cong. Rec. 20,484 (1996). We believe that this statement in the conferees' report cannot be taken as controlling.

As noted above, " '[f]ew principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language.' " *Cardoza-Fonseca*, 480 U.S. at 442–43 (citations omitted). Here, this rule cannot plausibly give way to contrary legislative history. Both houses of Congress deleted the definition of "federal means-tested public benefit": the Senate did so on the basis

---

[16] Similar inconsistencies appear in other provisions of the PRA as a result of Byrd rule deletions. For example, the family cap provision of S 1956, *see* § 103 of July 16 version of S 1956 (establishing new section 408(a)(2) of TANF program), was deleted through a Byrd rule objection. The conference report notes this deletion and the provision does not appear in the final version of the PRA. 142 Cong Rec 20,459 (1996) Nevertheless, a reference to the family cap provision remains, in § 103 of the PRA (establishing new § 402(a)(7) of title IV of the SSA), which permits states to waive program requirements in cases of domestic violence. 110 Stat. at 2112, 2115

[17] In fact, during Senate consideration of the conference version of the bill, Senator Graham confirmed, for himself and for any other members that might not have analyzed the list of excepted programs, that the post-conference version of the bill was consistent with the Senate's earlier Byrd rule objections, defining "federal means-tested public benefit" as applicable only to mandatory programs *See infra* note 20

[18] As a result, we do not believe it to be significant that the final version of the PRA also included exceptions for two discretionary programs that did not appear in the Senate version of the PRA from which the broad definition of "federal means-tested public benefit" had been deleted Specifically, the Head Start and Job Training programs were only included in the House's final list of exempted programs, and not the Senate's, even though they do appear in the final version of § 403(c)(2) 110 Stat. at 2266. The inclusion of these two additional exceptions does not change our conclusion because there is no reason to believe that the inclusion of exceptions for these particular discretionary programs, more than the exceptions for the other discretionary programs, was intended to do more than safeguard them from further definitional disagreements In any event, the inclusion in the final bill of two additional discretionary programs seems to us a most oblique means for Congress to reinsert a definition of "federal means-tested public benefit" that had previously been struck

of the CBA, and the House acceded to the Senate. A conference committee cannot essentially overrule those decisions by including contrary language in its report. To permit this to occur not only would run counter to the canon against construing a statute to include terms that Congress had earlier discarded, *id.*, but, even more fundamentally, would undermine the rules that were established with such care in section 313, which permit a Senator to object to extraneous material that the conference might include in the legislation itself, but provide no mechanism for correcting the conference's explanatory statement.[19] Finally, subsequent Senate colloquy — admittedly an insubstantial grounding for legislative intent if standing alone — confirms the understanding that a definition that would have extended the term to encompass discretionary programs was deleted because it was outside the subject matter scope of the reconciliation process.[20]

We thus conclude that the legislative record provides strong support for the proffered construction of the PRA and that the inconsistencies noted above, while giving rise to some ambiguity, are insufficient to rebut the evidence that Congress intended to reach only mandatory spending programs. We, accordingly, turn to the second step of the *Chevron* inquiry.

---

[19] Section 313 permits a Byrd rule objection to be made at various points throughout the legislative process, including after the bill has been reported out of conference. 2 U.S.C. § 644(c). Thus, the statute allows for the possibility that Congress might attempt to reinsert a deleted provision into a bill during conference, and provides the Senate with the opportunity to renew its Byrd rule objection if it insists upon the deletion However, because a Byrd rule objection can be raised only against legislative language, not against explanatory statements in the conference report, *see* § 644(a), allowing a conference report statement to act as the equivalent of legislative language effectively abolishes the statutory mechanism established to ensure the integrity of the Byrd rule process

[20] Specifically, in the debate over the conference report on the Senate floor, Senator Graham sought to confirm the exact scope of the term "federal means-tested public benefit." After reviewing the history of the Byrd rule objection and the Parliamentarian's ruling, Senator Graham engaged Senator Kennedy in the following colloquy.

> *Mr. Graham* . . . [W]ould the Senator agree that, when the Senate struck these sections as violating the Byrd rule, the Senate's intent was to prevent the denial of services in appropriated programs such as those that provide services to victims of domestic violence and child abuse, the maternal and child health block grant, social services block grant, community health centers and migrant health centers?

> *Mr. Kennedy* Yes. Under the Byrd rule, the budget reconciliation process cannot be used to change discretionary spending programs. Only mandatory spending is affected.

142 Cong. Rec. 20,975 (1996).

Senator Graham subsequently asked Senator Exon, who was one of the Senate conferees on the bill, whether "the version of the bill recommended in this conference report is consistent with this understanding." *Id* Senator Exon confirmed that it was. Later during the debate, Senator Graham raised this issue again with another conferee, Senator Chafee:

> *Mr. Graham* I wonder if my colleague could address one point on this bill. I notice that the term "Federal means-tested public benefit" was defined in previous versions of the bill However, in this conference report, no definition is provided.

> *Mr Chafee* . . [W]hen the bill was considered in conference, I understand that there was an intentional effort to ensure this provision complied with [the] Byrd rule by omitting the definition of that particular term.

> In other words, then, the term "Federal means-tested public benefit" — if it is to be in compliance with the Byrd rule — does not refer to discretionary programs.

*Id* at 20,979.

## II. *Chevron Step II*

Under the second step of the *Chevron* analysis, two questions arise. First, it is necessary to determine whether Congress intended for agencies or courts to resolve the ambiguity that Congress, either intentionally or inadvertently, failed to resolve. *See Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649 (1990) ("[a] precondition to deference under Chevron is a congressional delegation of administrative authority"); *see also Johnson v. United States R.R. Retirement Bd.*, 969 F.2d 1082, 1088 (D.C. Cir. 1992) ("If agencies are simply interpreting a statute, but have not been granted the power to 'administer' it, the principle of deference applies with less force."), *cert. denied*, 507 U.S. 1029 (1993). Second, if Congress intended for agencies to resolve the ambiguity, then it is necessary to determine whether the proposed agency interpretation is "permissible." *Chevron*, 467 U.S. at 843.[21] If Congress intended for the agencies to resolve the interpretive ambiguity, and the agency resolution is permissible, then the agency construction is binding.[22] *See id.*

### A.

Congress need not expressly authorize agencies to construe ambiguous statutory terms in order for courts to be bound by agency constructions. In *Chevron* itself, for example, the Court deferred to an Environmental Protection Agency ("EPA") construction of the Clean Air Act, even though no statutory language expressly empowered that agency to impose a binding interpretation of the term "stationary source." The Court simply inferred that Congress must have intended for the EPA, as the agency entrusted with administering the Clean Air Act, to resolve the policy choices that inhere in the interpretation of ambiguous statutory language. *See Chevron*, 467 U.S. at 843. The Court explained that this inference was reasonable because agencies generally possess superior expertise and greater political accountability than courts. *See id.* at 865–66.

On the other hand, Congress may impliedly authorize courts to interpret a particular statutory provision, even though an agency has been generally charged with administering the statute as a whole. In *Adams Fruit Co.*, for example, the Court refused to defer to the Department of Labor's resolution of the question whether exclusivity provisions in state worker compensation laws trumped a federal private right of action under the Migrant and Seasonal Agricultural Worker Protection

---

[21] Although the Court stated in *Cardoza-Fonseca* that *Chevron*-deference does not apply to pure questions of law, such as the one at issue here, it has subsequently retreated from this position Our memorandum proceeds on the assumption that *Chevron* applies to such questions. *Cardoza-Fonseca*, 480 U.S at 454–55 (Scalia, J., concurring)

[22] Even if Congress has *not* entrusted the interpretative function to an agency, courts should still give careful consideration to agency constructions that are based on expertise and to which they have consistently adhered. *See, e g., Atchison, Topeka and Santa Fe Ry. v. Pena*, 44 F 3d 437, 445 (7th Cir. 1994) (Easterbrook, J , concurring), *aff'd sub nom, Brotherhood of Locomotive Engineers v Atchison, Topeka & Santa Fe Ry*, 515 U S 1141 (1995).

Act, 29 U.S.C. §§ 1801–1872 (1994 & Supp. I 1995) ("Worker Protection Act"). Even though the Department was responsible for administering the Worker Protection Act generally, the Court concluded that Congress intended for the judiciary, not the agency, to construe the contours of the private right of action that the Worker Protection Act created. *See Adams Fruit Co.*, 494 U.S. at 649. The Court based that conclusion primarily on the fact that the Department was not required to interpret the private right of action provisions as an incident of its general administration of the Worker Protection Act, as those provisions established a parallel and independent enforcement mechanism. *See id.* at 649–50.

In our view, the delegation question presented here is more analogous to *Chevron* than to *Adams Fruit Co.* Although the PRA does not expressly delegate general administrative authority to HHS, HUD, or, for that matter, to any other particular agency, the PRA effectively amends the statutes that establish the assistance programs over which HHS, HUD and other federal agencies have already been delegated administrative authority. Because those agencies possess general administrative authority to interpret eligibility criteria set forth in statutes enacted prior to the PRA, we believe it to be a fair inference that Congress intended for the changes effected by the PRA to be administered in the same manner.

In an analogous context, the Third Circuit deferred to HHS' construction of the Hyde Amendment, even though, as the dissent in that case pointed out, the Hyde Amendment does not expressly delegate administrative authority to any agency. *Compare Elizabeth Blackwell Health Ctr. for Women*, 61 F.3d at 182, *with id.* at 196 (Nygaard, J., dissenting). The court concluded that HHS' authority to administer the Medicaid statute necessarily included the authority to construe legislation that amended the Medicaid statute's eligibility requirements. *Id.* at 182; *see also Fort Wayne Community Schools v. Fort Wayne Educ. Ass'n*, 977 F.2d 358, 365 (7th Cir. 1992) (deferring to Postal Service's construction of a criminal statute on the ground that it was "intimately connected" to the purposes of the statute that Postal Service was charged with administering), *cert. denied*, 510 U.S. 826 (1993); *Associated Third Class Mail Users v. United States Postal Serv.*, 600 F.2d 824, 826 n.5 (D.C. Cir.), *cert. denied*, 444 U.S. 837 (1979) (same).

The case for deference is even stronger here, moreover, because the PRA not only amends the eligibility requirements for the programs that these agencies administer, but also expressly assigns these agencies the responsibility of informing the public of the changes in those eligibility requirements that the PRA effects. Section 404(a) of the PRA requires federal agencies that administer assistance programs to provide the public with information about how the PRA changes the eligibility requirements for those programs.[23] This assignment, we believe, impliedly delegates to these agencies the authority to resolve the meaning of the

---

[23] "Each Federal agency that administers a program to which section 401, 402, or 403 applies shall, directly or through the States, post information and provide general notification to the public and to program recipients of the changes regarding eligibility for any such program pursuant to this subtitle " 110 Stat. at 2267

phrase ''federal means-tested public benefit'': agencies must first interpret the meaning of the term ''federal means-tested public benefit'' in order to comply with section 404(a)'s mandate to inform the public of the PRA's impact on eligibility requirements. Only by determining whether that term applies to both mandatory and discretionary assistance programs (among other questions of application) will agencies be able to determine who is eligible for the programs that they already administer pursuant to separate statutory delegations. Section 404(a)'s notification requirement serves a useful function, moreover, only to the extent that the agencies are able to provide *accurate* information about the eligibility changes that the PRA mandates. If courts are free to reject reasonable agency interpretations of that term, then agencies will be forced to risk providing inaccurate eligibility information or to refrain from providing complete eligibility information altogether. Because neither result seems consistent with the purpose behind section 404(a), it is proper to infer that Congress intended for the agencies to provide the authoritative construction of the term ''federal means-tested public benefit'' when it assigned them the notification task set forth in section 404(a).

In light of the agencies' statutorily assigned responsibilities, the agencies cannot fairly be viewed as ''trying to 'bootstrap' [themselves] into an area in which [they have] no jurisdiction'' in seeking deference for their construction of the term ''federal means-tested public benefit.'' *Wagner Seed Co. v. Bush*, 946 F.2d 918, 923 (D.C. Cir. 1991), *cert. denied*, 503 U.S. 970 (1992) (citation omitted). Rather, they are offering an interpretation that results from the ''intimate connection'' between the purposes of the statutes that the agencies already administer and those of the PRA generally, *Fort Wayne Community Schools*, 977 F.2d at 365, and that arises in connection with the ''special duty'' that section 404(a) of the PRA assigns them. *See FLRA v. Department of Treasury*, 884 F.2d 1446, 1451 (D.C. Cir. 1989), *cert. denied*, 493 U.S. 1055 (1990).

We are aware of those cases that assert that courts should not defer to statutes that are ''general'' in nature or that are subject to interpretation by more than one agency. *See, e.g., Johnson v. United States R.R. Retirement Bd.*, 969 F.2d at 1088 (citing cases). We do not believe that this rule of construction should apply here. The rule has been invoked primarily in cases in which agencies seek *Chevron* deference for their construction of statutes that have been expressly entrusted to other agencies for administration, *see id.; Cheney R.R. Co. v. Railroad Retirement Bd.*, 50 F.3d 1071, 1073–74 (D.C. Cir. 1995), that are designed to ensure that agencies remain publicly accountable or proceed in a fair manner, *see, e.g., Professional Reactor Operator Soc'y v. United States Nuclear Regulatory Comm'n*, 939 F.2d 1047, 1051 (D.C. Cir. 1991); *see Air North Am. v. Department of Transp.*, 937 F.2d 1427, 1436 (9th Cir. 1991), or that are not intimately connected to the mission of the agency that seeks deference. *See, e.g., Professional*

*Airways Sys. Specialists v. FLRA*, 809 F.2d 855, 857 n.6 (D.C. Cir. 1987). The results in these cases are, therefore, best explained as particular applications of the justifiable presumption that Congress does not intend for courts to be bound by agency constructions that are beyond agency expertise, *see, e.g., Colorado Nurses Ass'n v. FLRA*, 851 F.2d 1486, 1488 (D.C. Cir. 1988), or that concern provisions that are designed to ensure agencies proceed in a fair and accountable manner, *see Air North Am. v. Department of Transp.*, 937 F.2d at 1436. These cases do not establish, in our view, a general presumption in favor of judicial resolution of all statutory ambiguities that confront more than a single agency.

Indeed, *Chevron*'s emphasis on the greater political accountability of agencies counsels against a rule of construction that would afford judges the last word on the meaning of any statute that does not authorize a single agency to administer it. *See Chevron*, 467 U.S. at 865–66. Where, as here, a statute assigns a group of agencies a particular task that is related to the duties that the agencies already have been assigned by their governing statutes, Congress may be presumed to have intended for these agencies to resolve any ambiguities that may arise. That the PRA does not assign any particular agency primary interpretive responsibility does not change the analysis. Congress may have intended for the courts to resolve the meaning of the term "federal means-tested public benefit" in the event of unresolved interpretive conflicts among the agencies identified by section 404. There is no reason to suppose, however, that Congress intended for unelected judges to countermand a *unanimous* resolution of the policy question by the agencies closest to it. *Cf. American Fed'n of Gov't Employees v. FLRA*, 2 F.3d 6, 10 (2d Cir. 1993) ("[W]hen two agencies, each examining statutes they are charged with administering, agree as to the interplay of the statutes, there is no more reason to mistrust their congruent resolutions than there is to mistrust action taken by a single agency."); *see also Salleh v. Christopher*, 85 F.3d 689 (D.C. Cir. 1996) (suggesting that joint agency interpretations may deserve deference); *cf. Lieberman v. FTC*, 771 F.2d 32, 37 (2d Cir. 1985) (declining to defer to joint agency construction but noting that Congress may delegate "dual lawmaking authority"). So long as the agencies identified by section 404(a) concur in their interpretation of the term "federal means-tested public benefit," therefore, we believe that courts would be bound to accord that interpretation *Chevron* deference.

Finally, we do not believe that the deference that the agencies receive under *Chevron* should turn on whether their construction of the term "federal means-tested public benefit" would be deemed an "interpretative" or "legislative" rule under the Administrative Procedure Act. We agree with those courts that have concluded that *Chevron* deference turns solely on whether the agency's interpretation may fairly be understood to be one for which Congress intended judicial deference to apply, *see, e.g., Elizabeth Blackwell Health Ctr. for Women*, 61 F.3d at 182; *id.* at 190–96 (Nygaard J., dissenting) (reviewing conflicting caselaw);

35

*Kelley v. EPA*, 15 F.3d 1100, 1108 (D.C. Cir. 1994), *cert. denied*, 513 U.S. 1110 (1995); *see generally* Robert A. Anthony, *Which Agency Interpretations Should Bind Citizens and the Courts?*, 7 Yale J. on Reg. 1 (1990), and not on whether the proposed construction is "interpretative" or "legislative" in nature.[24] The latter determination, in our view, relates only to the procedural question whether the agency's rule may be promulgated outside the process of notice and comment rulemaking. That determination should have no bearing on the entirely separate question whether Congress intends for courts or agencies to resolve the interpretive ambiguity at issue.[25]

## B.

Given that Congress impliedly delegated to the agencies the responsibility for resolving the interpretive question raised by the PRA's use of the phrase "federal means-tested public benefit," the only remaining issue under step two of the *Chevron* analysis is whether the answer provided by the agencies "is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. If it is, that construction is binding. *Id.*

A definition of the term "federal means-tested public benefit" that includes only mandatory assistance programs is manifestly "permissible." The second step of the *Chevron* analysis arises only if Congress failed to resolve whether the term "federal means-tested public benefit" applies to discretionary assistance programs. The conclusion that Congress left that question open is possible only if the phrase admits of the proffered construction. The same reasons that led us to conclude that there is strong evidence to support the HHS and HUD proffered definition of "federal means-tested public benefit," *see infra* pp. 22–31, therefore, also show that the proffered definition is a "permissible" one. Moreover, HHS and HUD assert that their reading "best balances our Departments' other statutory obligations with Congressional goals embodied in the [PRA]." Rabb/Diaz Letter at 1. Under *Chevron*, agency constructions based on reasonable assessments of statutory purposes are entitled to deference. *See Chevron*, 467 U.S. at 858.

---

[24] The Supreme Court has stated in post-*Chevron* dicta that interpretive rules are entitled to less weight than "norms that derive from the exercise of the Secretary's delegated lawmaking powers." *See Martin v. Occupational Safety & Health Review Comm'n*, 499 U S 144, 157 (1991) More recently, however, the Court has intimated that interpretive rules may be entitled to *Chevron*-style deference *See Reno v Koray*, 515 U S 50, 60–61 (1995).

[25] Of course, there are clearly some instances in which informal agency interpretations may be presumed to be undeserving of full *Chevron* deference There are sound reasons, for example, to presume that Congress does not intend for courts to defer to agency litigating positions *See Bowen v. Georgetown Univ Hosp.*, 488 U S. 204, 212–13 (1988) Here, however, the agencies proffer their construction outside the litigation context. Moreover, we note that the very existence of the *Bowen* rule, which precludes the application of *Chevron* deference to agency litigating positions, would be unnecessary if all "interpretative" rules — including those fashioned outside the litigation process — were already precluded from receiving such deference

## CONCLUSION

We accordingly conclude that the HHS/HUD proffered definition constitutes a permissible and legally binding construction of the PRA.

DAWN E. JOHNSEN
*Acting Assistant Attorney General*

RANDOLPH D. MOSS
*Deputy Assistant Attorney General*
*Office of Legal Counsel*